Michael L. Baum (CA State Bar #119511)
mbaum@baumhedlundlaw.com
Frances M.  Phares (LA  State Bar #10388)
fphares@baumhedlundlaw.com
Ronald L.M. Goldman (CA State Bar #33422)
rgoldman@baumhedlundlaw.com
BAUM, HEDLUND, ARISTEI & GOLDMAN, P.C.
12100 Wilshire Boulevard, Suite 950
Los Angeles, California 90025
(310) 207-3233 Tel
(310) 820-7444 Fax

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LESLIE J. GRISHAM,

               Plaintiff,

      v.

PHILIP MORRIS USA INC., et al.

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.  02-7930 SVW (Rcx)

Judge:  Hon. Stephen V. Wilson

**PLAINTIFF'S SUPPLEMENTAL
BRIEF ON COLLATERAL
ESTOPPEL/ISSUE
PRECLUSION IN RELATION
TO MOTION TO STAY**

Hearing Date: September 14, 2009
Time: 1:30 p.m.
Location: Courtroom 6
Judge: Hon. Stephen V. Wilson

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.      Under established Supreme Court precedent, defendants should be
        precluded from re-litigating issues that they have previously
        litigated and lost. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.     This case meets the Ninth Circuit criteria for application of offensive
        non-mutual issue preclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        (a)     Defendants defrauded smokers and potential smokers
                by falsely denying the adverse health effects of
                smoking. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        (b)     Defendants defrauded smokers and potential smokers
                by falsely denying that nicotine and smoking are
                addictive. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        (c)     Defendants defrauded smokers and potential smokers
                by falsely denying that they manipulated cigarette
                design and composition so as to assure nicotine delivery
                levels that create and sustain addiction. . . . . . . . . . . . . . . . . . . 15

        (d)     Defendants suppressed documents, information, and
                research to prevent the public from learning the truth
                about these subjects and to avoid or limit liability in
                litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.    The application of issue preclusion to these defendants is fair. . . . . . . . 21

IV.     Other court's have recognized that tobacco companies should be
        barred from re-litigating issues that they have already litigated and
        lost in prior actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Engle v. Liggett Group, Inc.,*
    945 So.2d 1246, 1276-77 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hawkins v. Risley,*
    984 F.2d 321 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Jenson,*
    980 F.2d 1254 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*International Assen of Machinists v. Nix,*
    512 F.2d 125, 132 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Parklane Hosiery Co. v. Shore,*
    439 U.S. 322, 329 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 10, 14, 20-23

*Syverson v. IBM,*
    472 F.3d 1072, 1078l, n.8 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 5-7

*U.S. v. Philip Morris USA Inc.,*
    566 F.3d 1095, 1121 (D.C.Cir. May 22, 2009). . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Philip Morris USA, Inc.,*
    449 F.Supp.2d 1 (D.D.C. 2006), *aff'd,*
    566 F.3d 1095 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**SECONDARY AUTHORITIES**

*Moore's Federal Practice* § 132.03[2][a] (3d ed. 2007) . . . . . . . . . . . . . . . . . . 21

*Moore's Federal Practice* § 132.03[2][a] (3d ed. 2007) . . . . . . . . . . . . . . . . . . 21

On June 5, 2009 Grisham filed a motion to stay these proceedings pending finality of the District of Columbia's appellate ruling, which affirmed extensive findings of fact and conclusions of law by Judge Gladys Kessler in *United States v. Philip Morris USA, Inc*., 449 F.Supp.2d 1 (D.D.C. 2006), *aff'd*, 566 F.3d 1095 (D.C. Cir. 2009) ("*DOJ*" case).  Under the doctrine of collateral estoppel/issue preclusion and/or res judicata it is proper for this Court to adopt those findings and conclusions as being conclusively established in this case. Alternatively, Grisham requests that the Court stay these  proceedings until the *DOJ* decision is final.

## INTRODUCTION

Defendants Phillip Morris and Brown & Williamson should be precluded from re-litigating issues they have already lost.  Grisham is not alone in alleging that defendants have been engaged in a long-term scheme to conceal the risks of smoking and to defraud the public.  The United States Department of Justice ("DOJ") made similar allegations in its civil complaint alleging, *inter alia,* that defendants were engaged in an ongoing conspiracy to deceive the American public about the health effects of smoking and the addictiveness of nicotine.[1]

Following a nine month bench trial, testimony by over 200 witnesses and the admission of 14,000 exhibits into evidence, Judge Kessler concluded that defendants Phillip Morris and Brown & Williamson as well as other tobacco manufacturers violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") by engaging in a decades-long conspiracy to deceive the American public about the health effects and addictiveness of smoking cigarettes.[2]  Given that many issues in Grisham's case have already been litigated and adjudicated in

---

[1]  *See United States v. Philip Morris USA, Inc*., 449 F.Supp.2d 1 (D.D.C. 2006), *aff'd*, 566 F.3d 1095 (D.C. Cir. 2009) ("*DOJ* Case")

[2]  *See DOJ,* 566 F.3d at 1108.

Pltf's Suppl Brief on Collateral
Estoppel/Issue Preclusion

the *DOJ* case,[3] the defendants should be barred from re-litigating these issues.[4]

## ARGUMENT

**I.    Under established Supreme Court precedent, defendants should be precluded from re-litigating issues that they have previously litigated and lost.**

In *Parklane Hosiery Co. v. Shore*[5] the Supreme Court recognized that the doctrine of issue preclusion (i.e., collateral estoppel)[6]  may be used offensively to prevent "a defendant from re-litigating issues which a defendant previously litigated and lost against another plaintiff." The facts of *Parklane* are similar to the facts of this case.  There, the plaintiff filed a class action alleging the defendant had issued a false proxy statement in connection with a merger.  Before the case was tried, the Securities Exchange Commission (SEC) filed a separate suit against the same defendant, also alleging that the proxy statement was false and misleading.  The court in the SEC case entered a declaratory judgment that the proxy statement was materially false and misleading.[7]

After the SEC ruling, the *Parklane* plaintiff moved for partial summary judgment, asserting the defendant was barred from re-litigating the issues resolved against them in the SEC action.  The trial court granted plaintiff's motion, the Second Circuit reversed, but the Supreme Court agreed with the trial court that a litigant who was not a party to a prior judgement may nevertheless use that judgement offensively to prevent the defendant from re-litigating issues

---

[3] Grisham is filing concurrently an Appendix with exemplar findings in the DOJ case to prove her fraud allegations.

[4] *See e.g.*, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979).

[5] 439 U.S. 322, 329 (1979).

[6] Rather than using the term "collateral estoppel," the Supreme Court and the Ninth Circuit in recent years have used the more preferred term "issue preclusion". *See e.g.*, *Syverson v. IBM*, 472 F.3d 1072, 1078l, n.8 (9th Cir. 2007).

[7] *See Parklane*, 439 U.S. at 324-25.

1  resolved in the earlier proceeding.[8]

2        These tobacco defendants should be prevented from rearguing that they did

3  not make false representations or did not deceive the American public, including

4  Grisham, by concealing their internal knowledge of nicotine addiction,

5  manipulation of nicotine to create and sustain addiction (facts of which are

6  discussed *infra*), false creation of a health controversy in light of internal

7  knowledge, promotion and over promotion of light cigarettes as "safe" or "safer"

8  — all materially false and designed to deceive the public — as held in the *DOJ*

9  case.  As in *Parklane*, these issues have been "resolved" against these

10  Defendants.[9]

11  **II.   This case meets the Ninth Circuit criteria for application of offensive non-mutual issue preclusion.**

12  Relying upon *Parklane*, the Ninth Circuit has outlined the criteria for

13  application of offensive non-mutual issue preclusion.[10]  Issue preclusion is

14  appropriate when:

15  (1)    there was a full and fair opportunity to litigate the identical issue in the

16        prior action;

17  (2)    the issue was actually litigated;

18  (3)    the issue was decided in final judgement; and

19  (4)    the party against whom issue preclusion is asserted was a party or in privity

20

21

22

---

23      [8] *Parklane*, 439 U.S. at 332-33.

24      [9] Issue preclusion has also been applied in post-Engle v. Liggett Group, Inc.
25  tobacco litigation in Florida.  945 So.2d 1246 (Fl., 2006).  The issues precluded by the Florida Supreme Court are discussed *infra*.

26      [10] "Offensive Issue Preclusion" is when a plaintiff seeks to bar a defendant
27  from relitigating an issue that the defendant had previously lost in a prior action. The term "non-mutual" refers to the use of issue preclusion by a nonparty to a prior
28  action.  *Syverson*, 472 F.3d  at 1078, n.8.

with a party to the prior action. [11]

All four factors are present in the Grisham case. *First*, the issues adjudicated and findings of fact ("FOF") [12] in the *DOJ* case are identical to Grisham's allegations, particularly as to false representation, (Grisham's third C/A) and deceit and fraudulent concealment (Grisham's fourth C/A). Specifically, the *DOJ* court found that: (a) defendants defrauded smokers and potential smokers by falsely denying  the adverse health consequences of smoking; (b) defrauded smokers and potential smokers by falsely denying that nicotine and smoking are addictive; c) defrauded smokers and potential smokers by falsely denying that they manipulated cigarette design and composition so as to assure nicotine delivery levels that create and sustain addiction; and, (d) suppressed documents, information, and research to prevent the public from learning the truth about these subjects and to avoid or limit liability in litigation.[13]

Grisham's First Amended Complaint ("FAC") pled the *DOJ* fraud findings as allegations.  Grisham pled, for example:

> **(a)    *Defendants defrauded smokers and potential smokers by falsely denying the adverse health effects of smoking.***

This allegation was established as fact in the DOJ case.[14]  Exemplars of *DOJ* findings on this issue are:

---

[11] *Syverson v. IBM*, 472 F.3d 1072, 1078 (9th Cir. 2007) (setting out standard).

[12]  All references to "FOFs ¶¶ " refer to the District Court's opinion of detailed findings, issue by issue, in sequentially numbered  paragraphs at 449 F.Supp.2d 1 (D.D.C. 2006), *aff'd*, 566 F.3d 1095 (D.C. Cir. 2009) ("*DOJ* Case").

[13] *See, e.g.*, *U.S. v. Philip Morris USA Inc.*, 566 F.3d 1095, 1121 (D.C.Cir. May 22, 2009).

[14] [*See, e.g.,* FOF ¶¶ 509 - 604; 606 - 702; 704 - 801; 803 - 814; and, 821 822 - 827, found in Appendix A].

Pltf's Suppl Brief on Collateral
Estoppel/Issue Preclusion

- **FOF 509**:  Cigarette smoking causes disease, suffering, and death. Despite internal recognition of this fact, Defendants have publicly denied, distorted, and minimized the hazards of smoking for decades. The scientific and medical community's knowledge of the relationship of smoking and disease evolved [in] the 1950s and achieved consensus in 1964. However, even after 1964, Defendants continued to deny both the existence of such consensus and the overwhelming evidence on which it was based.

- **FOF 610**:  Beginning in the 1950s, all Defendants, including TIRC, the Tobacco Institute and TIRC's successor, The Council for Tobacco Research-U.S.A., Inc. ("CTR"), issued numerous false public statements designed to mislead the public about the connection between cigarette smoking and disease.

The defendants' actions were part of "a scheme"[15] orchestrated to influence public opinion and create doubt:

- **FOF 707**:  In November 1967, at the direction of outside lawyers David Hardy of Shook, Hardy & Bacon, and Ed Jacobs of Cabell, Medinger, Forsyth & Decker, the Tiderock Corporation, the Tobacco Institute's public relations firm, prepared an action plan titled 'The Cigarette Controversy.' The action plan proposed to influence public opinion by creating specific initiatives to re-open the 'open question' cigarette controversy. The program called for the creation of a position paper for intra-industry use as well as one for distribution to the media and public. The plan included targeted categories for mailings such as the medical profession, scientists, communicators (press, radio, television), educators, top public figures, and 10,000 top corporate presidents. It also detailed the publication of

---

[15]  The conclusions of law reached by the District Court based on its findings include that "Defendants Engaged in a Scheme to Defraud Smokers and Potential Smokers"  449 F.Supp.2d at 852.

1    magazine articles.

2    Likewise, Dr. William Farone, who testified in the *DOJ* case, will testify on

3    the same issues in Grisham:

4    •    **FOF 704**: The testimony of two high-level Philip Morris scientists fully

5    corroborates the documentary evidence . . . that Defendants were totally

6    aware of and convinced that smoking caused disease. . . [F]ormer Philip

7    Morris scientist Dr. William Farone, who worked at Philip Morris for 18

8    years[] was impressive and credible as both a fact and expert witness.

9    After analyzing over 300 separate facts derived from documentary

10   evidence and witnesses testimony, exemplars of which are in Grisham's

11   Appendix, the *DOJ* Court concluded:

12   •    **FOF 824:** From at least 1953 until at least 2000, each and every one of

13   these Defendants repeatedly, consistently, vigorously -- and falsely --

14   denied the existence of any adverse health effects from smoking.

15   Moreover, they mounted a coordinated, well-financed, sophisticated public

16   relations campaign to attack and distort the scientific evidence

17   demonstrating the relationship between smoking and disease, claiming that

18   the link between the two was still an "open question." Finally, in doing so,

19   they ignored the massive documentation in their internal corporate files

20   from their own scientists, executives, and public relations people that, as

21   Philip Morris's Vice President of Research and Development, Helmut

22   Wakeham, admitted, there was "little basis for disputing the findings [of

23   the 1964 Surgeon General's Report] at this time."

24   Grisham's FAC similarly pleads that Defendants falsely denied the adverse

25   health affects of smoking at ¶¶ 61-62, 64 (false representation) and ¶¶ 67-76

26   (deceit, fraudulent concealment).  Moreover, specific factual allegations

27   supporting these claims are cited in Section VI of Grisham's FAC, ¶¶ 162 - 189,

28

_____

Pltf's Suppl Brief on Collateral
Estoppel/Issue Preclusion

1    many of which are identical to the *DOJ* factual findings.

2            Grisham will offer the same documents and evidence cited by Dr. Farone in

3    his *DOJ* testimony.  Since that testimony and evidence has been conclusively

4    decided against these defendants, as *Parklane* mandates, issue preclusion would

5    eliminate the need for Dr. Farone to "repeat" his "impressive and reliable"

6    testimony or evidence supporting this issue.

7            **(b)    *Defendants defrauded smokers and potential smokers***

8            ***by falsely denying that nicotine and smoking are addictive.*** [16]

9            This allegation was established as fact in the DOJ case.  Exemplars of *DOJ*

10   findings on this issue are:

11   •    **FOF 942**:  According to Dr. William Farone, "Defendants have long

12        understood that cigarettes are addictive and that nicotine is the agent in

13        cigarette smoke primarily responsible for addiction. . . "

14   •    **FOF 943**:  Farone stated that "when I was at Philip Morris, there was

15        widespread acceptance internally throughout the company — among

16        executives, scientists, and marketing people — that nicotine was the

17        primary component of tobacco and cigarette smoke responsible for

18        smoker's addiction to smoking."

19           Also, the defendants have had a keen understanding of how nicotine and

20   smoking relate to addiction for more than 40 years:

21   •    **FOF 883**: For example, internal documents reveal that Philip Morris

22        researchers knew in 1969 that nicotine was "a powerful pharmacological

23        agent" and that the company operated on the "premise that the primary

24        motivation for smoking is to obtain the pharmacological effect of nicotine."

25        RJR's lead nicotine researcher stated in 1972 that nicotine is the "sine qua

26        non of smoking" and that the industry was based on the sale of "attractive

27   _____

28        [16] [*See,* FOF  ¶¶ 1146-1198; 1252; 1256-1365, found in Appendix A.]

_____

dosage forms of nicotine."   BATCo's sophisticated research from the early 1960s demonstrated that "smokers are nicotine addicts."  B & W, BATCo's American subsidiary, possessed the BATCo data and marketed cigarettes with the understanding that they "must provide the appropriate levels of nicotine."

- **FOF 884**: Defendants have studied nicotine and its effects since the 1950s. The documents describing their research into and resulting knowledge of nicotine's pharmacological effects on smokers — whether they characterized that effect as "addictive," "dependence" producing or "habituating," — demonstrate unequivocally that Defendants understood the central role nicotine plays in keeping smokers smoking, and thus its critical importance to the success of their industry.

- **FOF 887**:  These industry documents also support the conclusion that Defendants knew early on in their research that if a cigarette did not deliver a certain amount of nicotine, new smokers would not become addicted, and "confirmed" smokers would be able to quit.

Despite this knowledge, Defendants continued to publicly deny that nicotine was addictive and was the reason people continued to smoke:

- **FOF 1149**:  Philip Morris Chairman James C. Bowling denied that cigarette smoking was an addiction in a July 18, 1973 "60 Minutes" interview. Instead, Bowling compared the choice to stop smoking to the choice to eat eggs or not.

The DOJ court also found that Brown & Williamson had early knowledge of the addictive properties of nicotine but feared that disclosing this information could result in product restrictions and litigation:

- **FOF 1194:**  While B & W knew internally that smokers were addicts who smoked for nicotine, the company understood that the industry's "free choice" argument in litigation would be undermined by any suggestion that smoking and nicotine were addictive. In the words of long-time general counsel Ernest Pepples, in a February 14, 1973 "Confidential" memorandum to public relations director John Ballock, one of the "salient problems now facing the cigarette industry" was:

  ADDICTION-Some emphasis is now being placed on the habit forming capacities of cigarette smoke. To some extent the argument revolving around "free choice" is being negated on the grounds of addiction. The threat is that this argument will increase significantly and lead to further restrictions on product specifications and greater danger in litigation.

The Defendants' public denials that nicotine is addictive are false and misleading:

- **FOF 882**: The wealth of documentary evidence examined in this Section, as well as Sections V(c) and (d), reveals that for decades Defendants knew and internally acknowledged that nicotine is an addictive drug, that cigarettes are a nicotine delivery device, and that addiction can be enhanced and perpetuated - manipulating both the amount of nicotine and the method of nicotine delivery. Much of Defendants' knowledge of nicotine was obtained from in-house and industry-funded research into the pharmacological effects of the drug.

Dr. Neal Benowitz, another of Grisham's witnesses, and an "expert in nicotine toxicology and nicotine pharmacokinetics"[17] testified about nicotine addiction, manipulation, and nicotine delivery. On the mechanics of nicotine

---

[17] [FOF 1596].

addiction, Dr. Benowitz explained:

- **FOF 834**: The more quickly nicotine is absorbed, the higher its concentration in the body and the greater its effects. Smoking nicotine provides the fastest rate of absorption and highest blood levels of nicotine. On average, one cigarette delivers 1mg to 1.5 mg of nicotine.

- **FOF 836**: Nicotine produces two different kinds of effects. First, there are certain primary effects of nicotine on the brain that smokers find desirable. For example, the first cigarette in the morning usually has a stimulating or alerting effect. Similarly, if a person is feeling stressed or anxious, nicotine may reduce that stress or relieve that anxiety and make a person feel better. Smokers may, however, develop tolerance to many of these primary effects. As occurs with the use of all psychoactive drugs, the brain attempts to adapt to the persistent presence of nicotine. This adaptation, or tolerance, produces actual changes in the brain's structure. Over time, the brain becomes tolerant to the effects of nicotine and needs even greater amounts of it to produce the same effects on hormones as it once did before the development of tolerance.

Dr. Farone agreed:

- **FOF 838**: In commonly understood terms, smokers become dependent on the significant pharmacological and psychoactive effects of the nicotine in cigarettes, resulting in craving, compulsive use, difficulty in quitting, and relapse after withdrawal.

The *DOJ* court found widespread scientific acceptance of nicotine as the primary factor leading to smoking addiction.  Dr. David Burns, another of Grisham's experts also agreed with Dr. Farone:

- **FOF 840**: [There is] now an overwhelming consensus in the scientific and medical community that cigarette smoking is an addictive behavior and that

1    nicotine is the component in cigarettes that causes and sustains the

2    addiction.

3         In sum, the *DOJ* findings of fact and conclusions of law, conclusively

4    establish that the Defendants misrepresented and denied that nicotine is addictive.

5    The government's experts who testified in the *DOJ* case are the same experts who

6    will be testifying on the same issues in Grisham's case.  The *DOJ* court found this

7    testimony to be "impressive, reliable, persuasive and credible."[18]  Simply because

8    the Defendants could not overcome the "overwhelming" evidence against them

9    on these issues is no reason to deny issue preclusion, as held by the *Parklane*

10   court.

11        Grisham's allegations of the defendants' fraud in misrepresenting the

12   powerful effects of nicotine upon the human brain to create a state of addiction

13   and the defendants' public denials that cigarettes are addictive — that smoking is

14   only a "habit" or that "anyone can quit at any time" — juxtaposed against their

15   own internal research and knowledge otherwise, are the basis of Grisham's

16   claims.  The *DOJ* case conclusively establishes as fact and law Grisham's

17   allegations on these issues.  The defendants should not be allowed a second bite at

18   the apple to re-litigate these "already decided" matters where the witnesses, the

19   testimony and documentary evidence on those issues overlap from one case to the

20   other, especially in instances such as this, where the issues have been finally

21   determined.  This Court's application of offensive issue preclusion would shorten

22   the Grisham trial because there would be no need to call or present evidence from

23   Drs. Farone, Benowitz or Burns on her fraud and misrepresentation allegations.

24        (c)    ***Defendants defrauded smokers and potential smokers
              by falsely denying that they manipulated cigarette***

25            ***design and composition so as to assure nicotine***

26

27   ─────────────────

28        [18] *See*, FOF 704, 1596,  2104 and 2129.

─────────────────────────────────────────────────────

*delivery levels that create and sustain addiction.*[19]

This allegation was established as fact in the DOJ case.  Exemplars of *DOJ* findings on this issue are:

- **FOF 1366**:  Defendants have long known that nicotine creates and sustains an addiction to smoking and that cigarette sales, and ultimately tobacco company profits, depend on creating and sustaining that addiction. Section V(B)(3), *supra.* Given the importance of nicotine to the ultimate financial health of Defendants, they have undertaken extensive research into how nicotine operates within the human body and how the physical and chemical design parameters of cigarettes influence the delivery of nicotine to smokers. Using the knowledge produced by that research, Defendants have designed their cigarettes to precisely control nicotine delivery levels and provide doses of nicotine sufficient to create and sustain addiction. At the same time, Defendants have concealed much of their nicotine-related research, and have continuously and vigorously denied their efforts to control nicotine levels and delivery.
- **FOF 1372**:  As Defendants' knowledge and understanding of nicotine delivery evolved, they identified and developed more sophisticated product design techniques that would assure the delivery of the minimum dose of nicotine to provide smokers with sufficient "impact" and "satisfaction," regardless of the type of cigarette."

Thus, the *DOJ* findings conclusively establish that Defendants researched, studied and made intentional and calculated corporate decisions to manipulate nicotine delivery to consumers such as Grisham — by incorporating additives such as ammonia into their cigarette products — to not only alter the chemical

[19] [*See* FOF ¶¶ 1366-1399; 1493-1503; 1508-1562; 1573-1591; and 1705-1763, found in Appendix A.]

form of nicotine delivered by mainstream smoke, but to increase nicotine transfer efficiency during the smoking process.  The underlying purpose for manipulating nicotine appears to be to increase profits:

- **FOF 1497**: [A 1973 Reynolds document explaining the goal of high smoke pH reported that] " [a] high pH smoke is strong due to a high concentration of unbound, or free, nicotine in the smoke. . . Correlation of these values with sales trends were made and the results showed even stronger positive correlations than were found for smoke pH-sales trends studies. . . In 1982, Reynolds reported internally that shortly after Philip Morris began increasing smoke pH and free nicotine through the introduction of added ammonia . . . in 1965, Philip Morris's sales began growing very rapidly. . .

     Another main reason for the defendants to manipulate nicotine was to keep smokers addicted and physiologically dependent upon cigarette products.  Drs. Benowitz and Farone testified about the physiology of nicotine absorption:

- **FOF 1599**:  The pH of tobacco smoke is significant because it affects the chemical form of nicotine delivered in mainstream smoke, which in turn affects the rate and amount of nicotine delivery and the speed of absorption of nicotine over certain biological membranes. Nicotine in cigarette smoke is found primarily in two different chemical states: either the protonated "bound" form or the unprotonated "free" form. At any given pH level, there is a ratio of free to protonated nicotine. As cigarette smoke becomes more basic-that is, as the smoke pH rises-more of the nicotine is delivered in its 'free,' unprotonated chemical form. As more nicotine is delivered in the free, unprotonated form, a greater proportion of the nicotine is also delivered in the gas phase of smoke."

- **FOF 1601**:  Free nicotine is more volatile and more physiologically active than bound nicotine.   Consequently, it transfers more rapidly across the

biological membranes of the mouth and lungs, and then to the brain, than bound nicotine. Even with increased amounts of free nicotine, very little of the nicotine taken in by a smoker is absorbed in the mouth or throat. Usually, about 90% passes on to the lungs where it is absorbed.  Because free nicotine transports across cells more rapidly, the presence of more free nicotine in cigarette smoke also increases nicotine's effect on the central nervous system. By producing an increased and more rapid effect on the central nervous system, free or unbound nicotine gives the smoker a faster and more intense "kick."   The speed with which a drug is delivered to the body influences its addictive potential. The speed of delivery can be influenced by factors such as: where the drug is targeted, the pH, and the concentration of the drug in vapor form.

- **FOF 1603**: It is well established in the scientific community that the freebase forms of other drugs of abuse, such as freebase cocaine, are more reinforcing and addicting than their non-freebase counterparts because of the speed with which they reach the brain.  The effects of pH on changing the chemical form of alkaloids like cocaine have been discussed in scientific literature for decades. Similarly, alteration of pH is a well established, scientifically-effective means of dose control for certain substances, in particular substances in which variation of pH within physiologically tolerable parameters affects the fraction of drug transferred across membranes of the mouth and throat. Techniques to alter pH so as to change the proportion of free and bound molecules of a substance are understood and employed by pharmaceutical companies to control the bioavailability of many drugs, including nicotine in nicotine-delivering medications.

With respect to altering nicotine and the pH of smoke:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- **FOF 1606**:  Another effective method for altering pH is by using additives in the manufacturing process, such as ammonia or ammonia-based compounds, or other compounds that create ammonia when burned. Ammonia compounds are basic substances that may raise the pH level and convert bound nicotine to free nicotine.

- **FOF 1607**:  Defendants were well aware of the particular chemical characteristics and effects of free nicotine, and undertook efforts to exploit these features. Internal research at Philip Morris confirmed that cigarette smoke that is more basic increases nicotine's effects on the central nervous system, and that the "rate of entry [of nicotine into the bloodstream] is pH dependent." . . . As one Reynolds document explained: "In essence, a cigarette is a system for delivery of nicotine to the smoker in attractive, useful form. . . . As the smoke pH increases above about 6.0, an increasing proportion of the total smoke nicotine occurs in "free" form, which is volatile, rapidly absorbed by the smoker, and believed to be instantly perceived as nicotine "kick."

These factual findings are only a few of many that unmistakably establish the defendants' manipulation of nicotine was thoroughly considered by the *DOJ* court who concluded that Defendants fraudulently concealed this information from the public and from the government[20]:

- **FOF 1758**:  The Defendants have repeatedly made vigorous and impassioned public denials-before Congressional committees, in advertisements in the national print media, and on television-that neither smoking nor nicotine is addictive, and that they do not manipulate, alter, or control the amount of nicotine contained in the cigarettes they manufacture.

---

[20]  Specific findings of fact and the corresponding supporting evidence addressing the manipulation and design defect issue are contained in Judge Kessler's opinion, beginning at pages 337 - 370, ¶¶ 1508 - 1679.

The Findings of Fact contained in this Section and Section V(B), *supra,* provide overwhelming evidence that those statements are false.

• **FOF 1759**:   [The] cigarette company Defendants researched, developed, and implemented many different methods and processes to control the delivery and absorption of the optimum amount of nicotine which would create and sustain smokers' addiction. These methods and processes included, but were not limited to: altering the physical and chemical make-up of tobacco leaf blends and filler; maintaining or increasing the nicotine to tar ratio by changing filter design, ventilation and air dilution processes, and the porosity and composition of filter paper; altering smoke pH by adding ammonia to speed nicotine absorption by the central nervous system; and using other additives to increase the potency of nicotine."

• **FOF 1762**:   [T]he words of Defendants themselves establish that the goal of their extensive efforts, research and experimentation, to control the levels of nicotine delivery was to ensure that smokers obtained sufficient nicotine to create and sustain addiction.

Grisham's complaint alleges similar allegations, which have been established as fact in the *DOJ* case.  Further, The Grisham's experts on this issue are, again, the same experts who testified in the *DOJ* case.  Re-litigating the same issue already decided by the *DOJ* court is unnecessary.  Issue preclusion is thus proper.

  *(d)   Defendants suppressed documents, information, and research to prevent the public from learning the truth about these subjects and to avoid or limit liability in litigation.*

The *DOJ* court found that these defendants suppressed pertinent smoking

1  risk data.[21]  Grisham has also pled that the defendants suppressed and concealed

2  scientific research, destroyed documents, and  improperly used attorney-client

3  and work-product privilege to conceal the defendants' conduct.  She would

4  present the same testimony and exhibits to support her allegations.  Her

5  allegations that defendants suppressed information have now been established as

6  fact in the *DOJ* case .  Thus, issue preclusion is appropriate for these claims.[22]

7       The *DOJ* case was litigated for over seven years, including a nine-month

8  trial in which defendants had the opportunity to present numerous witnesses and

9  documents and to fully and fairly litigate these issues.  Judge Kessler's ruling is

10 an 1800 page detailed and scholarly opinion chronicling the defendants'

11 fraudulent conduct.  The defendants appealed her ruling, which was affirmed in

12 relevant part on appeal.[23]  Thus, the first issue preclusion factor of a full and fair

13 opportunity to litigate the identical issue is satisfied.

14      *Second*, as demonstrated *infra,* the testimony of witnesses, both percipient

15 and expert, as well as the documentary evidence cited by the *DOJ* court,

16 establishes Grisham's fraud claims[24] because those same fraud claims were

17 actually litigated in the *DOJ* action.  The "actually litigated" requirement is that

18 the issue must have been raised, contested by the parties, submitted for

---

21  [*See, e.g.,* FOF ¶¶ 3863 - 3885; 3887 - 3926; 3929 - 4017; and 4021 - 4035, exemplars of which are contained in Grisham's Appendix].

22  *Parklane*, 439 U.S. at 332-33 (defendant was barred from re-litigating the issue of whether it had made false and misleading representations); *see also International Assen of Machinists v. Nix,* 512 F.2d 125, 132 (5th Cir. 1975) (prior ruling that employees had stolen documents precluded re-litigation of that issue).

23  *See DOJ,* 566 F.3d at 1105.

24  *DOJ* findings of fact also establish some of the facts necessary to prove Grisham's negligence, strict products liability, and breach of warranty claims.

Pltf's Suppl Brief on Collateral
Estoppel/Issue Preclusion

1  determination by the court and determined.[25]  The *DOJ* action concerned the

2  defendants' fraudulent conduct in misrepresenting and concealing health risks,

3  which conduct was pled in the *DOJ* complaint and heatedly contested by the

4  parties during the nine-month trial.  The matter was  submitted to the court for

5  determination, the court made findings of fact on those specific issues, and a final

6  judgment was entered.[26]  Accordingly, the second factor is satisfied.

7        *Third*, findings of fact and conclusions of law on fraud were decided by a

8  final judgement:  the *DOJ* court issued a lengthy opinion and entered final

9  judgement on August 17, 2006.  Notably, the Court also issued an injunction,

10  enjoining the defendants from engaging in further acts of concealment and

11  fraud.[27] On May 22, 2009 the Court of Appeals affirmed in relevant part the

12  district court's findings and orders.[28]  Thus, the third factor of a final judgment is

13  satisfied.

14        *Fourth*, there is no denying that Phillip Morris and Brown & Williamson,

15  and its successor in interest, R. J. Reynolds, were defendants in the *DOJ* case and

16  are, therefore, subject to issue preclusion.  Thus, all of the issue preclusion factors

17  are satisfied, and defendants should be barred from re-litigating the issues they

18  lost in the *DOJ* case.[29]

19  **III.    The application of issue preclusion to these defendants is fair.**

20        In *Parklane*, the Supreme Court recognized that in certain rare instances

21

22        [25] *See* 18 James W. Moore et al., *Moore's Federal Practice* § 132.03[2][a] (3d
    ed. 2007).

23

24        [26] *DOJ*, 449 F.Supp.2d at 1, *aff'd*, 566 F.3d at 1105.

25        [27]  *DOJ*, 449 F.Supp.2d at 938.

26        [28] *DOJ*, 566 F.3d at 1105.

27        [29] The fact that Grisham was not a party in the *DOJ* suit, is of no moment
    since the Supreme Court has held that non-parties may raise collateral estoppel
28  offensively.  *Parklane*, 439 U.S. at 327-28.

Pltf's Suppl Brief on Collateral
Estoppel/Issue Preclusion

1  the application of offensive non-mutual issue preclusion may be unfair to
2  defendants.  The Court identified four instances where it may not be fair to apply
3  offensive non-mutual  issue preclusion:  (1) "the plaintiff had the incentive to
4  adopt a 'wait and see' attitude in the hope that the first action by another plaintiff
5  would result in a favorable judgment" which might then be used against the
6  losing defendant; (2) the defendant did not have an incentive to defend the first
7  suit with full vigor, especially when future suits are not foreseeable; (3) one or
8  more judgments entered before the one invoked as preclusive are inconsistent
9  with the latter or each other, suggesting that reliance on a single adverse judgment
10  would be unfair; and, (4) the defendant might be afforded procedural
11  opportunities in the later action that were unavailable in the first "and that could
12  readily cause a different result."[30]  Because none of these considerations were
13  present in *Parklane*, the court permitted issue preclusion.

14      Similarly, in Grisham, there are no circumstances that would make the
15  offensive use of issue preclusion unfair to the defendants.  *First*, Grisham could
16  not have joined the injunctive action brought by the U.S. Department of Justice.[31]

17      *Second*, given the serious fraud allegations raised in the DOJ's RICO
18  complaint, defendants had every incentive to vigorously defend — and did
19  vigorously defend — the *DOJ* action.  On this note, the Supreme Court has
20  recognized that when defendants have a special incentive to vigorously prosecute
21  claims brought by the government: ([In light of ] "the forseeability of subsequent
22  private suits that typically follow a successful Government judgement,
23  [defendant] had every incentive to litigate the SEC lawsuit fully and

---

[30] *Parklane*, 439 U.S. at 330-31.

[31] *See Parklane*, 439 U.S. at 331-32 (recognizing that plaintiff probably could not have joined in the injunctive action brought by the SEC).

---

Pltf's Suppl Brief on Collateral
Estoppel/Issue Preclusion

1  vigorously."[32])  Likewise, these defendants were on notice that the *DOJ* action

2  would impact other pending and subsequent private suits and had every incentive

3  to litigate it fully and vigorously.[33]

4       *Third*, the detail and specificity of the *DOJ* opinion is unmatched and *not*

5  inconsistent with any previous government-initiated injunctive action against the

6  defendants.  Notably, even in the *DOJ* action the defendants argued that "no

7  injunction was necessary" because their settlement with other states sufficiently

8  restrained them from engaging in further fraud.[34]  Thus, defendants themselves

9  have tacitly and judicially conceded that there is no inconsistency.

10       *Finally*, there will be no procedural opportunities available to defendants in

11  this case that were unavailable in the DOJ.[35]  Thus, none of the concerns outlined

12  in *Parklane* are present here, and this Court should conclude that defendants are

13  barred from re-litigating issues that they had already litigated and lost in the *DOJ*

14  action.

15  **IV.   Other court's have recognized that tobacco companies should be**
16  **barred from re-litigating issues that they have already litigated and lost in prior actions.**

17       Other courts have permitted issue and claim preclusion in tobacco cases.  In

18  2006 the Florida Supreme Court gave res judicata (issue preclusion) effect to the

19  findings of a jury in a class action that found, *inter alia,* that (a) smoking  causes

20  various forms of cancer; (b) nicotine in cigarettes is addictive; c)  defendants

21  placed cigarettes on the market that were defective and unreasonably dangerous;

22

23     [32] *See Parklane*, 439 U.S. at 332.

24     [33] Defendants vigor is further demonstrated by their overtures that they intend
25  to further appeal the *DOJ* action to the Supreme Court of the United States.

26     [34] *See DOJ*, 566 F.3d at 1109.

27     [35] *See e.g., Parklane*, 439 U.S. at 332, n.19 (noting that the fact that earlier
28  action was a bench trial and the subsequent action afforded a jury trial was no
reason to deny issue preclusion).

1  (d)  defendants concealed or omitted material information not otherwise known or
2  available knowing that the material was false or misleading or failed to disclose a
3  material fact concerning the health effects or addictive nature of smoking
4  cigarettes or both; (e) defendants agreed to conceal or omit information regarding
5  the health effects of cigarettes or their addictive nature with the intention that
6  smokers and the public would rely on this information to their detriment; (f) all of
7  the defendants sold or supplied cigarettes that were defective (g) all of the
8  defendants sold or supplied cigarettes that, at the time of sale or supply, did not
9  conform to representations of fact made by said defendants, and (h) all of the
10  defendants were negligent. *Engle v. Liggett Group*, *Inc.*, 945 So.2d 1246, 1276-
11  77 (2006).  The Florida Supreme Court held that in future tobacco cases
12  individual plaintiffs should not be required to prove up the foregoing findings and
13  that these findings will be given effect in any subsequent actions. *Id.* at 1277.[36]

## CONCLUSION

15  Applying collateral estoppel/issue preclusion in this case serves the very
16  purpose for which it was designed:  putting an end to re-litigation of matters that
17  have been extensively examined and determined and saving judicial resources.
18  Grisham has demonstrated, both above and in her attached Appendix, over-
19  lapping facts, issues, and conclusions of law reached in the *DOJ* that also apply to
20  her case.  Consequently, the *DOJ* findings of fact and conclusions of law should
21  be applied, unless this Court determines that finality has not been established
22  because the Supreme Court has neither granted nor denied certiorari.
23  Alternatively, Grisham requests that her case be stayed pending finality of

26  _____

27  [36] While the *Engle* case arose out of a decertified class action, its logic and
conclusions as to the application of res judicata and issue preclusion are equally
28  applicable to the *Grisham* case.

_____

Pltf's Suppl Brief on Collateral
Estoppel/Issue Preclusion

1    the *DOJ* case.[37]

2

3    Dated: July 27, 2009                Respectfully Submitted,

4                                        BAUM, HEDLUND, ARISTEI & GOLDMAN, P.C.

5

6                                        By:   /s/ Frances M. Phares
7                                              Frances M. Phares, Esq.
                                               Michael L. Baum, Esq.
8                                              Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   _____

27   [37]  *See, e.g., In re Jenson*, 980 F.2d 1254 (9th Cir. 1992) and *Hawkins v. Risley*, 984 F.2d 321 (9th Cir. 1993).  (The preclusive effect of a federal judgment
28   cannot be suspended simply by taking an appeal.)

     _____

                                                    Pltf's Suppl Brief on Collateral
                                                    Estoppel/Issue Preclusion

1  STATE OF CALIFORNIA                          )
                                                } ss.
2  COUNTY OF LOS ANGELES                        )

3

4        I am employed in the County of Los Angeles, State of California.  I am
   over the age of 18 years, and am not a party to the within action; my business
5  address is 12100 Wilshire Blvd., Suite 950, Los Angeles, California 90025.

6        On the date hereinbelow specified, I served the documents described as set
   forth below on the named defendants in this action as follows:

7  **Date of Service:**          **July 27, 2009**

8  **Document Served:**          PLAINTIFF'S SUPPLEMENTAL BRIEF ON
                                 COLLATERAL ESTOPPEL/ISSUE PRECLUSION IN
9                                RELATION TO MOTION TO STAY

10 **Parties Served:**           **SEE ATTACHED SERVICE LIST**

11
    X    **(VIA THE COURT'S ECF FILING SYSTEM)**
12
    __   **(BY PERSONAL SERVICE)**
13
    X    **(BY U.S. MAIL)**  I caused such envelope(s) with postage thereon fully
14       prepaid to be placed in the United States mail at Los Angeles, California.  I
         am "readily familiar" with the firm's practice of collection and processing
15       or correspondence for mailing.  It is deposited with the U.S. Postal Service
         on the same day in the ordinary course of business.  I am aware that on
16       motion of the party served, service is presumed invalid if postal
         cancellation date or postage meter date is more than one day after date of
17       deposit for mailing in affidavit.

18  X    **(BY E-MAIL)** I caused said documents to be transmitted via facsimile to
         the e-mail addresses marked on the attached service list.
19
    __   **(BY FACSIMILE)** I caused said documents to be transmitted via facsimile
20       to the offices of the addressee(s) marked on the attached service list.

21        I declare that I am employed in the office of a member of the bar of this
   court at whose direction the service was made.
22
   **EXECUTED**: July 27, 2009 at Los Angeles, California.
23

24                                        _____
                                              /s/ Sheila Beam
25                                            Sheila Beam

26

27

28
   _____

                                              Pltf's Suppl Brief on Collateral
                                              Estoppel/Issue Preclusion

1  SERVICE LIST

2

3  Frank P. Kelly
   fkelly@shb.com
4  Tammy B. Webb
   tbwebb@shb.com
5  Ingrid Peterson
   ipeterson@shb.com
6  Patrick J. Gregory
   Pgregory@shb.com
7  Dana N. Gwaltney
   dgwaltney@shb.com
8  SHOOK, HARDY & BACON L.L.P.
   333 Bush Street, Suite 600
9  San Francisco, California 94104-2828
   Telephone: (415) 544-1900
   Facsimile: (415) 391-0281
10
   Attorneys for Philip Morris USA, Inc.
11

12 Erin L. Dickinson
   eldickinson@jonesday.com
13 Amanda S. Jacobs
   asjacobs@jonesday.com
14 JONES DAY
   North Point
15 901 Lakeside Avenue
   Cleveland, OH 44114
16 Telephone: (216) 586-3939
   Facsimile: (216) 579-0212
17
   Peter N. Larson
18 pnlarson@jonesday.com
   JONES DAY
19 555 California Street, 26th Floor
   San Francisco, CA 94104
20 Telephone: (415) 626-3939
   Facsimile: (415) 875-5700
21
   Attorneys for Brown & Williamson Holdings, Inc.
22 (formerly known as Brown & Williamson Tobacco Corp.)

23

24

25

26

27

28

_____