HEADER LINE

PAGE 1 SHEET 1

2262

```
                 UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK
     - - - - - - - - - - - - - - - - - X
                                        :  CV-98-3287
     BLUE CROSS and BLUE SHIELD          :
     Of NEW JERSEY, et al,               :
                                         :
                 Plaintiffs,             :  United States Courthouse
                 -against-               :  Brooklyn, New York
                                         :
     THE AMERICAN TOBACCO COMPANY;       :
     R. J. REYNOLDS TOBACCO COMPANY;     :
     B.A.T INDUSTRIES, PLC; BROWN &      :  April 10, 2001
     WILLIAMSON TOBACCO CORPORATION;     :  9:30 a.m.
     PHILIP MORRIS INCORPORATED;         :
     and LORILLARD TOBACCO COMPANY,      :
                                         :
                 Defendants.             :
     - - - - - - - - - - - - - - - - - X
                        TRANSCRIPT OF TRIAL
                BEFORE THE HONORABLE JACK B. WEINSTEIN
               UNITED STATES DISTRICT JUDGE, and a jury

     APPEARANCES:

     For the Plaintiffs:      DEWEY BALLANTINE LLP
                              1301 Avenue of the Americas
                              New York, New York 10019-6092

                         BY:  PAUL J. BSCHORR, ESQ.
                              VINCENT R. FITZPATRICK, ESQ.
                              ROBERT MORROW, ESQ.
                              MICHAEL C. HEFTER, ESQ.
                              HEATHER K. McDEVITT, ESQ.

                   FOR THE DEFENDANTS:

     BROWN & WILLIAMSON       SEDGWICK, DETERT,
        and BATCo:            MORAN & ARNOLD ESQS.
                              One Embarcadero Center
                              16th floor
                              San Francisco, California 94111

                         BY:  KEVEN J. DUNNE, ESQ.
                              JAMES T. CONLON, ESQ.

              GR      OCR      CM      CSR
```

PAGE 2

2263

```
  1  Lorillard Tobacco Co.:
     Council for Tobacco        SHOOK, HARDY & BACON LLP
  2  Research:                  One Kansas City Place
     Tobacco Institute:         1200 Main Street
  3                             Kansas City, Missouri 64105

  4                        BY: WILLIAM L. ALLINDER, ESQ.
                                LORI CONNORS McGRODER, ESQ.
  5

  6

  7  Philip Morris:             ARNOLD & PORTER
     CTR:                       555 Twelfth Street, N.W.
  8  TI:                        Washington, D.C. 20004

  9                        BY: MURRAY R. GARNICK, ESQ.
                                PETER K. BLEAKLEY, ESQ.
 10

 11

 12  R.J. Reynolds:             COLLIER SHANNON SCOTT, PLLC
     CTR:                       3050 K Street, NW  Suite 400
 13  TI:                        Washington D.C. 20007-5108

 14                        BY: JOHN B. WILLIAMS, ESQ.

 15

 16  For B.A.T Industries:      SIMPSON THACHER & BARTLETT
                                425 Lexington Avenue
 17                             New York, New York 10017-3954

 18                        BY: JOSEPH McLAUGHLIN, ESQ
                                ADAM STEIN, ESQ.
 19

 20

 21
     Liggett Group, Inc.        KASOWITZ, BENSON, TORRES
 22  Brook Group Ltd:             & FRIEDMAN, LLP
                                1633 Broadway
 23                             New York, N.Y. 10019

 24                        BY: LEONARD A. FEIWUS, ESQ.

 25

              GR      OCR      CM      CSR
```

PAGE 3

2264

```
  1            FOR THE DEFENDANTS: (Cont'd.)

  2

  3  R.J. Reynolds:             WOMBLE CARLYLE SANDRIDGE & RICE
     CTR:                       200 West Second Street
  4  TI:                        Post Office Drawer 84
                                Winston-Salem, North Carolina 27102
  5

  6                        BY: URSULA HENNINGER, ESQ.

  7

  8  Lorillard and Lewis:       GREENBERG TRAURIG LLP
                                885 Third Avenue
  9                             21st floor
                                New York, New York 10022-4834
 10
                           BY:  ALAN MANSFIELD, ESQ.
 11                             STEPHEN SAXL, ESQ.

 12

 13

 14

 15

 16

 17
     Court Reporter:            Gene Rudolph
 18                             225 Cadman Plaza East
                                Brooklyn, New York
 19                             (718) 260-2538

 20

 21      Proceedings recorded by mechanical stenography.
                  Transcript produced by CAT.
 22

 23

 24

 25

              GR      OCR      CM      CSR
```

PAGE 4

2265

```
  1           (The following occurred in the absence of the jury.)

  2           THE COURT: Is plaintiffs' counsel here?

  3           (Pause.)

  4           MR. BLEAKLEY: Are you ready for us, Judge?  Or do

  5  you have something else?

  6           THE COURT: Are you going to represent the

  7  plaintiff?

  8           MR. HEFTER: I will, Your Honor. I apologize.

  9           THE COURT: The first item on the agenda, I believe,

 10  is this list of defendants' documents filed April 9 used on

 11  the cross-examination of Richard Pollay.

 12           I assume there is no objection.

 13           MR. WILLIAMS: Yes. I just checked with Mr. Pace,

 14  Your Honor. Plaintiffs have no objection to those.

 15           THE COURT: All right. The reporter is requested to

 16  list in the record at this point as admitted all documents

 17  listed as listed from A to O and then to return the package to

 18  Ms. Lowe.

 19           (The following documents are admitted into evidence

 20  as indicated by the Court.)

 21      A. DX DEM 006189 (excerpt from the 1979 Surgeon

 22  General's report)

 23      B. DX DEM 007952 (excerpt from the 1987 Economic

 24  Report of the President)

 25      C. DX DEM 006733 (excerpt from Darmon and Laroche,

              GR      OCR      CM      CSR
```

PAGE 13 SHEET 4

2274

1  document that you didn't give notice of.
2       What about 1210?
3       MR. HEFTER: No, Your Honor. We did give -- we did
4  provide notice of these documents.
5       THE COURT: You did provide notice of all of these?
6       MR. BLEAKLEY: They were not on Doctor Farone's
7  reliance list.
8       THE COURT: He is not an expert.
9       MR. BLEAKLEY: We were provided the documents.
10      THE COURT: You were provided the documents?
11      MR. BLEAKLEY: Yes. Not the reliance list.
12      THE COURT: He is not an expert. He doesn't have to
13 rely on anything.
14      MR. BLEAKLEY: I understand that. I am not raising
15 that issue now.
16      THE COURT: What is the issue now?
17      MR. BLEAKLEY: The issue is there is no foundation
18 for this witness's testimony. It is being represented that he
19 is going to say he saw the document. If he is going to claim
20 he saw the document, we will deal with it on cross.
21      THE COURT: All right. Is that true of all these
22 documents? He saw them?
23      MR. BLEAKLEY: No, it is not true with all these
24 documents. He hasn't said even with respect to one of
25 these --

           GR    OCR    CM    CSR

PAGE 14

2275

1       THE COURT: Excuse me. Excuse me.
2       MR. HEFTER: I can't say it's true for all of them.
3  For a significant majority of the documents, Your Honor,
4  Doctor Farone was involved in discussions about the subject
5  matters within the documents. For at least one of them I can
6  see that in fact he's even mentioned in the document. That's
7  PTX 9722.
8       THE COURT: To the extent that he says that he was
9  involved with the subject matter or the personalities during
10 his employment, I will allow them to come in. He is not an
11 expert so we don't have a reliance list problem.
12      MR. BLEAKLEY: Judge, I want to make it clear, my
13 objection is not on the grounds that they weren't on his
14 reliance list. My objection is upon the grounds that these
15 are documents that he didn't send, nor receive, nor is he
16 shown as having received a copy of it.
17      If the witness will get on the witness stand and
18 claim that he saw it, I understand. Then my job is to
19 cross-examine him about it. But unless he is going to
20 represent that he saw the document, then I don't believe there
21 is any foundation for his testimony.
22      THE COURT: If he says he knew the people at the
23 time, they were working at the time, and that the subject of
24 the document was discussed with him at the time, I think they
25 can come in.

           GR    OCR    CM    CSR

PAGE 15

2276

1       MR. BLEAKLEY: That's your ruling. We will have to
2  deal with it.
3       THE COURT: You make an objection to each one
4       MR. BLEAKLEY: That's not the case with all these
5  documents. There are some more here.
6       THE COURT: Okay. I can't keep the jury. You will
7  have to make objections as they come in -- as they are
8  offered.
9       Don't offer them until you have established the
10 foundation.
11      MR. HEFTER: Yes, Your Honor.
12      THE COURT: I just can't keep the jury. I'm sorry
13 But you know you should come in here. I was here at 9:00
14 o'clock.
15      MR. BLEAKLEY: I was here at 9:00 o'clock, Judge.
16      THE COURT: I don't say this critically. I know it
17 is difficult. But we had between 9:00 and 10:00 o'clock to
18 take care of this problem. I can't keep the jury waiting
19 while we do this.
20      MR. HEFTER: I apologize.
21      THE COURT: The jury really makes great effort to get
22 here.
23      (Jury present.)
24      MR. HEFTER: Should I get the witness, Your Honor?
25      THE COURT: Good morning, everybody.

           GR    OCR    CM    CSR

PAGE 16

2277

1       My apologies. I apologize. It is not regrets. It's
2  an apology for keeping you waiting.
3       Will the witness come forward?
4       MR. HEFTER: Your Honor, Empire calls Doctor William
5  Farone.
6       THE COURT: Face me, please.
7  W I L L I A M     A N T H O N Y     F A R O N E
8  called as a witness, having been first duly sworn,
9  was examined and testified as follows:
10      THE COURT: Give your name and spell it, please.
11      THE WITNESS: William Anthony Farone, F A R O N E.
12      MR. HEFTER: Good morning, ladies and gentlemen.
13 DIRECT EXAMINATION
14 BY MR. HEFTER:
15 Q   Good morning, Doctor Farone.
16 A   Good morning.
17 Q   Can you please introduce yourself to the jury?
18 A   My name is William Farone.
19      A JUROR: Can't hear, Your Honor.
20      THE COURT: Can't hear him.
21      The technology --
22      THE WITNESS: I think this will work.
23      Can you hear me okay now? I will try and talk
24 louder.
25      My name is William Farone.

           GR    OCR    CM    CSR

PAGE 17 SHEET 5

Farone-direct-Hefter 2278

1  Q  Doctor Farone, we have heard from a number of medical
2  doctors in this case so far. You are not a medical doctor.
3  You have a Ph.D in chemistry; is that correct?
4  A  That is correct.
5  Q  Where do you currently live?
6  A  Ervine, California
7  Q  Are you married?
8  A  Yes, I am.
9  Q  How long have you been married?
10 A  Eighteen years.
11 Q  How long have you lived in California?
12 A  About sixteen years.
13 Q  Are you employed in California?
14 A  Yes, I am.
15 Q  Where do you work?
16 A  For a company called Applied Power Concepts,
17 Incorporated.
18 Q  Where is your company based?
19 A  Anaheim, California
20 Q  This is a company that you started on your own?
21 A  Yes, it is.
22 Q  Describe for me, briefly, what Applied Power Concepts
23 does.
24 A  We are involved in all types of biochemical, chemical
25 technology, usually dealing with environmental issues.

GR   OCR   CM   CSR

PAGE 18

Farone-direct-Hefter 2279

1  Q  Can you give me one or two examples of something that you
2  are working on currently?
3  A  Yes.
4     We have two series of products, for example, that you
5  inject in the ground to clean up pollution. For example, dry
6  cleaning solvents that may drop down into the ground from a
7  dry cleaning establishment, they used to have to dig those up
8  and figure out some place to put them. We developed a product
9  that you can inject in the ground. It allows the bacteria
10 that are already in the ground to eat those chemicals so they
11 simply go away, and we have a product like that.
12    We also have developed a product made from sugar and
13 fat that's an insecticide. So you can spray it on insects.
14 It will kill the insects but it's been approved as a food by
15 the Food and Drug Administration. So it's not toxic to
16 people.
17 Q  In working on these projects, do you use your expertise
18 in chemistry?
19 A  I do.
20 Q  Now, prior to start working at your current company,
21 where did you work?
22 A  It was a predecessor company. My company actually
23 is -- took over one that I formed after I left Philip Morris;
24 but prior to these companies, I worked for Philip Morris.
25 Q  That's the Philip Morris who is a defendant in this case?

GR   OCR   CM   CSR

PAGE 19

Farone-direct-Hefter 2280

1  A  Yes, it is.
2  Q  You left there in 1984, correct?
3  A  That is correct.
4  Q  I will get back to the circumstances surrounding your
5  departure from Philip Morris but right now I would like for
6  you to describe for the jury your job titles while you were
7  there.
8  A  While I worked at Philip Morris, I had two different
9  jobs. For one year, I was -- held the position of Associate
10 Principal Scientist, reporting --
11 Q  Who -- I'm sorry.
12 A  Reporting to the Vice president of Research and
13 Development.
14 Q  Who was the Vice President of Research and Development at
15 the time?
16 A  Doctor Robert B. Seligman.
17 Q  When you interviewed at the company, who was the
18 Vice President of research and Development at the company?
19 A  At that time it was Doctor Helmut Wakeham.
20 Q  Was Doctor Wakeham the top scientist at Philip Morris
21 when you joined the company?
22 A  Yes, he was.
23 Q  In what year did you join the company?
24 A  1976.
25 Q  What did it mean to be the top scientist at Philip

GR   OCR   CM   CSR

PAGE 20

Farone-direct-Hefter 2281

1  Morris?
2  A  It means that he had the most experience in the area, was
3  recognized by the company as someone who would have the most
4  knowledge or the highest amount of knowledge about cigarette
5  technology.
6  Q  Who did Doctor Wakeham report to?
7  A  In 1976, when I interviewed, he reported to Mr. Clifford
8  Goldsmith, I believe, and then subsequent to that he was
9  promoted to a position where he reported directly to the -- I
10 think either the Vice President or Senior Vice President of
11 Philip Morris, Incorporated. Philip Morris, Incorporated
12 owned Philip Morris USA.
13 Q  Philip Morris USA is the domestic tobacco business of
14 Philip Morris?
15 A  That is correct.
16 Q  What was Mr. Robinson's position? You said?
17 A  Seligman.
18 Q  No. The Cliff --
19 A  Clifford Goldsmith.
20 Q  Goldsmith. I'm sorry.
21 A  Mr. Goldsmith at the time that I interviewed was the
22 President of Philip Morris USA, if I recall correctly.
23 Q  You also mentioned you had another position while you
24 were at Philip Morris. What was that?
25 A  Yes. After a little less than one year I became Director

GR   OCR   CM   CSR

Page 1242

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
------------------------------X
BLUE CROSS and BLUE SHIELD,     : CV-98-3287
of NEW JERSEY, et al,           :
                                :
              Plaintiffs,       : U.S. Courthouse
                                : Brooklyn, New York
         v.                     :
                                :
THE AMERICAN TOBACCO COMPANY;   : TRANSCRIPT OF TRIAL
R.J. REYNOLDS TOBACCO COMPANY;  :
B A.T. INDUSTRIES, PLC; BROWN   :
& WILLIAMSON TOBACCO CORPORATION;: April 2, 2001
PHILIP MORRIS INCORPORATED;     : 9:30 a.m.
and LORILLARD TOBACCO COMPANY,  :
                                :
              Defendants.       :
------------------------------X

BEFORE:
         THE HONORABLE JACK B. WEINSTEIN, U.S.D.J.,
                        and a Jury

APPEARANCES:

For the Plaintiffs:    DEWEY BALLANTINE LLP
                       1301 Avenue of the Americas
                       New York, New York 10019-6092
                 BY:   PAUL J. BSCHORR, ESQ.
                       -VINCENT R. FITZPATRICK, ESQ.
                       ROBERT MORROW, ESQ.
                       MICHAEL C. HEFTER, ESQ.
                       HEATHER K. McDEVITT, ESQ.

For the Defendants:

BROWN & WILLIAMSON     SEDWICK, DETERT, MORAN
and BATco:             & ARNOLD, ESQS.
                       One Embarcadero Center - 16th floor
                       San Francisco, California 94111
                 BY:   KEVEN J. DUNNE, ESQ
                       JAMES T. CONLON, ESQ
```

Page 1243

```
APPEARANCES (Cont.'d).

Lorillard Tobacco Co      SCHOOK, HARDY & BACON LLP
Council for Tobacco       One Kansas City Plaza
Research                  Kansas City, Missouri 64105
Tobacco Institute    BY:  WILLIAM L ALLINDER, ESQ
                          LORI CONNORS McGRODER, ESQ

Philip Morris             ARNOLD & PORTER
CTR                       555 Twelfth Street, N.W.
TI                        Washington, D.C. 20004
                     BY:  MURRAY R GARNICK, ESQ
                          PETER K BLEAKLEY, ESQ

R.J. Reynolds             COLLIER SHANNON SCOTT, PLLC
CTR                       3050 K Street, NW - Suite 400
TI                        Washington, D.C. 20007-5108
                     BY:  JOHN B WILLIAMS, ESQ

B.A T.                    SIMPSON THACHER & BARTLETT, ESQS
Industries                425 Lexington Avenue
                          New York, New York 10017
                     BY:  JOSEPH McLAUGHLIN, ESQ
                          ADAM STEIN, ESQ

Liggett Group, Inc.       KASOWITZ, BENSON, TORRES
Brook Group Ltd.            & FRIEDMAN, LLP
                          1633 Broadway
                          New York, New York 10019
                     BY:  LEONARD A FEIWUS, ESQ

R J. Reynolds             WOMBLE CARLYLE SANDRIDGE & RICE
CTR                       200 West 2nd Street
TI                        P O Drawer 84
                          Winston-Salem, NC 27102
                     BY:  URSULA HENNINGER, ESQ

Lorillard                 GREENBERG TRAURIG LLP
and Lewis                 885 Third Avenue - 21st Floor
                          New York, New York 10022 - 4834
                     BY:  ALAN MANSFIELD, ESQ
                          STEPHEN SAXL, ESQ
```

Page 1244

```
Official Court Reporter.   Mickey Brymer, RPR
                           U.S. District Court
                           225 Cadman Plaza East - Room 374
                           Brooklyn, New York  11201

                           (718) 260-2439

Proceedings recorded by mechanical stenography.

Transcript produced by Computer-Assisted Transcription

                           * * *
```

10    THE CLERK  civil cause on trial, Blue Cross Blue
11  Shield of New Jersey, et al versus Philip Morris
12  Incorporated, et al.
13        Good morning  Any applications?
14    MR. FITZPATRICK  I do not believe we have any
15  applications.
16    MR. WILLIAMS  That is correct.
17    MR. FITZPATRICK  Your Honor, you did mention perhaps
18  half-day issues.
19    THE COURT  Yes. Get me the white pad on my desk.
20    MR. FITZPATRICK  we are trying to juggle.
21    THE COURT  Yes. My problem is this: Justice Breyer
22  is coming up from Washington Thursday and Friday to deliver
23  the Rosenberg lecture at Columbia and then to participate in
24  the moot court and the dean wants me there because I'll be a
25  part of the whole thing. I could take Thursday and Friday

Page 1245

1  off, but I hate to do that because we lose momentum with the
2  jury when we take a break. So, one other way of handling it
3  might be bring them in a little early on Thursday, nine, and
4  work until twelve. And, then, Friday start at one and go
5  until 4:30. That will put a little pressure on me, but I
6  would rather that than take the two days off. I will just cut
7  out some of the formalities.
8        MR. WILLIAMS: I'm sorry. What's the schedule
9  Friday, your Honor?
10       THE COURT: One to 4:30, maybe five. One to 4:30.
11 What do you think?
12       MR. FITZPATRICK: Whatever is your pleasure, your
13 Honor.
14       THE COURT: Is that workable?
15       MR. FITZPATRICK: It is workable.
16       MR. WILLIAMS: That's fine.
17       THE COURT: I rather do it than take two days off.
18       MR. FITZPATRICK: We don't mean to dislocate you too
19 much on Friday. If you would rather not we can just --
20       THE COURT: It is such a long case. It seems to me
21 better for the jury to come in every day, if possible. Then
22 let's plan it that way. I'll tell the jury this morning nine
23 to twelve on Thursday and one to 4:30 on Friday.
24       MR. WILLIAMS: Your Honor, while we are on scheduling
25 issues, when we were selecting the jury, one of them indicated

Page 1310

1  AFTERNOON SESSION.
2  (The jury enters the courtroom.)
3  THE COURT: Have the witness come forward, please.
4  MS McDEVITT: Your Honor, we call Dr. Neal Benowitz.
5  NEAL BENOWITZ, called as the witness
6  herein, having been first duly sworn, testified as follows:
7  THE COURT: Give your name and spell it, please.
8  THE WITNESS: It is Neal Benowitz, B-e-n-o-w-i-t-z.
9  THE COURT: Thank you, sir.
10 DIRECT EXAMINATION
11 BY MS McDEVITT:
12 Q. It seems like a bit of time elapsed since Monday, so I'll
13 reintroduce myself. I'm Heather McDevitt and I represent
14 Empire.
15    Good afternoon, Dr. Benowitz. How are you?
16 A. Fine, thank you.
17 Q. I will start off by asking you a few questions about your
18 qualifications. Now, your expertise is in the field of
19 nicotine addiction, right?
20 A. Yes.
21 Q. Are you a medical doctor?
22 A. Yes.
23 Q. Could you tell us a little bit about yourself and your
24 background?
25 A. Well, I'm MD'ed in Rochester, New York, University of

Page 1311

1  Rochester. I graduated in 1969. I then did internship and
2  residency in internal medicine at Bronx Municipal Hospital
3  Center, also known as Jacobi Hospital in The Bronx. I then
4  went to San Francisco to do a post doctoral fellowship in
5  clinical pharmacology. That was at University of California,
6  San Francisco, where I have stayed on since that time. I
7  finished my fellowship in clinical pharmacology in 1973. I
8  then stayed on as an instructor, assistant associate, full
9  professor of medicine which I have been since about 1987. I
10 am also chief of the clinical pharmacology division of the
11 Department of Medicine which is a division sort of analogous
12 to, say, cardiology or something, but which deals with drug
13 related issues, teaching medical students about how to use
14 drugs, drug evaluation. There is a large poison center that's
15 part of my division as well. I'm based at the San Francisco
16 General Hospital which is the main county hospital in San
17 Francisco, where we basically take care of indigent patients,
18 patients without insurance in the County of San Francisco.
19 Q. Are you board certified in any medical field?
20 A. Yes, in three fields. Mainly internal medicine and then
21 there's also clinical pharmacology and medical toxicology.
22 Those are two specialty boards within the medical field.
23 Q. Could you tell us what clinical pharmacology is.
24 A. Clinical pharmacology is a specialty of medicine that
25 deals with studying the effects of drugs, doing research on

Page 1312

1  drug effects, dealing with the best way to use medications,
2  dealing with the assessment of drug reactions and, also,
3  poisonings to some extent, like drug overdoses.
4  Q. Could you tell us what medical toxicology is.
5  A. That is in some respects a portion of clinical
6  pharmacology that deals with the science of evaluation and
7  treatment of people who have suffered injuries from drugs or
8  chemicals. For example, a poison center practices medical
9  toxicology. We have a large occupational toxicology program
10 which deals with workplace exposures to chemicals, highway
11 spills, things like that. Those are all part of medical
12 toxicology.
13 Q. You've told us a bit about the different components of
14 your employment. I would like to take them one by one.
15    You have a clinical practice; is that right?
16 A. Yes. I spend about a third of my time in patient care.
17 My outpatient practice is a cardiology practice. So, it is a
18 half a day a week where I see patients who have heart
19 disease. I then spend two months of the year as attending
20 physician in charge of one of the medicine wards. One of them
21 is general internal medicine and one is cardiology. Then, for
22 about six weeks a year I'm the consulting physician to our
23 poison center, toxicology consultation service.
24 Q. Do you see patients with smoking related diseases?
25 A. Well, in my cardiology practice there are quite a few

Page 1313

1  patients who are smokers. Smoking is a well known cause of
2  heart disease and I have to deal with them on a regular basis
3  trying to get them to quit smoking.
4     Can I ask can I get a glass of water? Is that
5  possible?
6     THE COURT: Yes. I've used all my water. We'll get
7  some more.
8     THE WITNESS: Thank you.
9  Q. So, would you say that you work with patients who you say
10 deal with smoking and addiction issues?
11 A. Yes, on a regular basis. A significant percentage of my
12 patients are cigarette smokers who I deal with them trying to
13 encourage them to stop smoking because smoking is terrible for
14 heart disease.
15 Q. Could you describe for the jury your teaching activities.
16 A. I do sort of three kinds of teaching. One is what's
17 called bedside teaching. So, when I see patients in my
18 cardiology clinic there are interns, residents and medical
19 students there who see patients with me. When I am attending
20 physician on the medicine ward or cardiology ward we have a
21 team that's interns, residents and the medical students and,
22 so, we spend time going over each patient, talking about
23 elements of diagnosis and treatment. I also do course work
24 teaching. There is a course for senior medical students,
25 fourth year medical students that I coordinate in

HEADER LINE

PAGE 1  SHEET 1

473

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
 2   - - - - - - - - - - - - - - - - X
 3                                   :   CV-98-3287
     BLUE CROSS and BLUE SHIELD       :
 4   of NEW JERSEY, et al,            :
 5              Plaintiffs,           :   United States Courthouse
          -against-                   :   Brooklyn, New York
 6
     THE AMERICAN TOBACCO COMPANY;    :
 7   R. J. REYNOLDS TOBACCO COMPANY;  :
     B.A.T INDUSTRIES, PLC; BROWN &   :   March 27, 2001
 8   WILLIAMSON TOBACCO CORPORATION;  :   9:00 o'clock a.m.
     PHILIP MORRIS INCORPORATED;      :
 9   and LORILLARD TOBACCO COMPANY,   :
10              Defendants.           :
     - - - - - - - - - - - - - - - - X
11              TRANSCRIPT OF TRIAL
12       BEFORE THE HONORABLE JACK B. WEINSTEIN
         UNITED STATES DISTRICT JUDGE, and a jury
13
     APPEARANCES:
14
     For the Plaintiffs:      DEWEY BALLANTINE LLP
15                            1301 Avenue of the Americas
                              New York, New York 10019-6092
16
                        BY:   PAUL J. BSCHORR, ESQ.
17                            VINCENT R. FITZPATRICK, ESQ.
                              ROBERT MORROW, ESQ.
18                            MICHAEL C. HEFTER, ESQ.
                              HEATHER K. McDEVITT, ESQ.
19
20              FOR THE DEFENDANTS:
21   BROWN & WILLIAMSON       SEDGWICK, DETERT,
         and BATCo:           MORAN & ARNOLD ESQS.
22                            One Embarcadero Center
                              16th floor
23                            San Francisco, California 94111
24                      BY:   KEVEN J. DUNNE, ESQ.
25                            JAMES T. CONLON, ESQ.

                    GR    OCR    CM    CSR
```

PAGE 2

474

```
 1   Lorillard Tobacco Co.:
     Council for Tobacco       SHOOK, HARDY & BACON LLP
 2   Research:                 One Kansas City Place
     Tobacco Institute:        1200 Main Street
 3                             Kansas City, Missouri  64105
 4                       BY:   WILLIAM L. ALLINDER, ESQ.
                               LORI CONNORS McGRODER, ESQ.
 5
 6
 7   Philip Morris:            ARNOLD & PORTER
     CTR:                      555 Twelfth Street, N.W.
 8   TI:                       Washington, D.C. 20004
 9                       BY:   MURRAY R. GARNICK, ESQ.
                               PETER K. BLEAKLEY, ESQ.
10
11
12   R.J. Reynolds:            COLLIER SHANNON SCOTT, PLLC
     CTR:                      3050 K Street, NW, Suite 400
13   TI:                       Washington D.C. 20007-5108
14                       BY:   JOHN B. WILLIAMS, ESQ.
15
16
     For B.A.T Industries:     SIMPSON THACHER & BARTLETT
17                             425 Lexington Avenue
                               New York, New York 10017-3954
18
                         BY:   JOSEPH McLAUGHLIN, ESQ.
19                             ADAM STEIN, ESQ.
20
21
     Liggett Group, Inc.       KASOWITZ, BENSON, TORRES
22   Brook Group Ltd:            & FRIEDMAN, LLP
                               1633 Broadway
23                             New York, N.Y. 10019
24                       BY:   LEONARD A. FEIWUS, ESQ.
25

                    GR    OCR    CM    CSR
```

PAGE 3

475

```
 1         FOR THE DEFENDANTS: (Contd.)
 2
 3   R.J. Reynolds:       WOMBLE CARLYLE SANDRIDGE & RICE
     CTR:                 200 West Second Street
 4   TI:                  Post Office Drawer 84
                          Winston-Salem, North Carolina 271
 5
 6                  BY:   URSULA HENNINGER, ESQ.
 7
     Lorillard and Lewis:  GREENBERG TRAURIG LLP
 8                         885 Third Avenue
                           21st floor
 9                         New York, New York 10022-4834
10                   BY:   ALAN MANSFIELD, ESQ.
                           STEPHEN SAXL, ESQ.
11
12
13
14
15
16
17   Court Reporter:       Gene Rudolph
18                         225 Cadman Plaza East
                           Brooklyn, New York
19                         (718) 260-2538
20
21   Proceedings recorded by mechanical stenography.
             Transcript produced by CAT.
22
23
24
25
                    GR    OCR    CM    CSR
```

PAGE 4

476

```
 1      (The following occurred in the absence of the jury.)
 2      THE COURT: What would you like to take up first?
 3      MR. BLEAKLEY: Your Honor, we submitted to the Court
 4   this morning, I don't know whether you got it.
 5      THE COURT: I haven't gotten anything from the
 6   plaintiffs in response. Let me see your draft.
 7      MR. BLEAKLEY: This is on preemption -- the
 8   preemption issue.
 9      THE COURT: Let me see the charge you wanted.
10      Thank you.
11      MR. BLEAKLEY: Yes, sir.
12      (Pause.)
13      THE COURT: Well, where is Exhibit 1? I just have
14   Exhibits 2 and 3.
15      MR. BLEAKLEY: Did I forget to give you one? Sorry.
16      THE COURT: Has the plaintiff seen these?
17      MR. BSCHORR: We got them about twenty minutes ago,
18   Your Honor.
19      THE COURT: Develop your answer to them. Then we
20   will proceed.
21      All right. I have a small calendar.
22      (Recess taken.)
23      (Continued on next page.)
24
25
                    GR    OCR    CM    CSR
```

PAGE 177 SHEET 45

Opening - Dunne                                                     649

1  well aware of it.
2           Next, please.
3           Oh, I'm sorry.
4           What do the subscribers know?  One hundred and
5  fifty-six were deposed.  One hundred and forty-eight out of
6  the one hundred and fifty-six knew it was difficult to quit.
7           One hundred and forty-eight of the one hundred and
8  fifty-six knew someone else who found it was difficult to
9  quit.
10          Next, please.
11          All the one hundred and fifty-six subscribers
12 testified that they had never heard a statement by the tobacco
13 industry that smoking was easy to quit.  The reason for that
14 is the tobacco industry never said that.  They never said it
15 was easy to quit.  No matter what words they used to describe
16 addiction, habit of addiction, dependence, nobody ever said it
17 was easy to quit and nobody thought that it was easy to quit.
18          If you've ever known a smoker, you know it's not easy
19 to quit.  It's a common knowledge.
20          What did the Empire employees and what did the Empire
21 officials say about their knowledge?  Well, we took the
22 deposition of dozens of their employees and I am only going to
23 play two and I am going to play them very quickly.  The first
24 one I am going to play is Carmine Annirati.
25          MR. BSCHORR:  Your Honor, again, I rise.

                        GR     OCR     CM     CSR


PAGE 178

Opening - Dunne                                                     650

1           THE COURT:  Yes.  I think you can play that during
2  your presentation.
3           MR. DUNNE:  Thank you, Your Honor.
4           THE COURT:  Sustained.
5           MR. DUNNE:  He became Director of Professional
6  Activities in 1952.  He rose to become Vice president and
7  Corporate Secretary.  Here is what he said.
8           MR. BSCHORR:  I thought Your Honor just sustained it.
9           THE COURT:  Yes.
10          MR. DUNNE:  I beg your pardon.  You had ruled earlier
11 I could play these two, Your Honor.
12          THE COURT:  All right.  If you think --
13          MR. DUNNE:  It will be very quick.
14          MR. BSCHORR:  It is again going to Empire awareness
15 which is not in this case.
16          THE COURT:  Go ahead.  Play then.
17          MR. BSCHORR:  It's all cumulative.
18          (Tape plays; tape stops.)
19          MR. DUNNE:  And the last tape I will play is the
20 president of Empire.  His name is Michael Stocker.  He is a
21 medical doctor.  I will let his testimony spoke for itself.
22          (Tape plays; tape stops.)
23          MR. DUNNE:  Now, faced with this evidence, that its
24 subscribers were well aware of the risks of smoking, Empire
25 will put on evidence of two things.  We know because we have

                        GR     OCR     CM     CSR


PAGE 179

Opening - Dunne                                                     651

1  seen the evidence.
2           The first evidence is at the depositions of the
3  subscribers, they would be cross-examined by Empire and they
4  would be shown documents and told these documents are secret
5  internal documents and asked a hypothetical, to speculate.
6           (Continued on next page.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                        GR     OCR     CM     CSR


PAGE 180

Dunne-opening                                                       652

1           MR. DUNNE:  (Continuing) I--
2           THE COURT:  Excuse me, I don't want this at this
3  stage.
4           MR. DUNNE:  Very well.  I think they're going to put
5  on -- all right.  I'll try one other thing.  I'm not going to
6  argue it, your Honor.
7           In fact, what I'm going to do, I think what everybody
8  wants me to do is I'll stop.  I just want to say in quick
9  closing that one of the things Empire has to do, they have to
10 prove to you, they have the burden of proving to you that
11 their subscribers were defrauded, misled, did not know, relied
12 on something we said and the overwhelming evidence that we
13 have obtained from the subscribers is that they didn't rely on
14 the tobacco industry whatsoever in making their health and
15 tobacco choices.  At the end of the case, we're going to ask
16 you to give us a defense verdict.  Thank you very much.
17          THE COURT:  Thank you.
18          Call your first witness.
19          MR. BSCHORR:  Your Honor, could I approach the
20 bench?
21          THE COURT:  No.  We just have time for a brief
22 introduction.
23          MR. BSCHORR:  We have a couple of applications.
24          MR. FITZPATRICK:  Good afternoon.  I'm
25 Mr. Fitzpatrick representing Empire.  I'm finally going to put

                        GR     OCR     CM     CSR

PAGE 181  SHEET 46

Dunne-opening                                                      653

    1   on a witness for you. I would ask our first witness,
    2   Dr. David Burns to take the stand.
    3           THE COURT:  Face me and be sworn.
    4   D A V I D  M.  B U R N S,
    5           having been duly sworn, was examined and
    6           testified as follows:
    7           THE COURT:  Give your name, spell it, please.
    8           THE WITNESS:  David Michael Burns, B U R N S.
    9   DIRECT EXAMINATION
   10   BY MR. FITZPATRICK:
   11   Q   Good afternoon, Dr. Burns.
   12   A   Good afternoon.
   13   Q   I would like to cover in the brief time we've got today
   14   your qualifications.
   15           Are you a medical doctor, sir?
   16   A   Yes, I am.
   17   Q   What kind of medical doctor are you?
   18   A   I'm a pulmonary physician, physician who specializes in
   19   lung disease.
   20   Q   Could you give us a little bit of your background?
   21   A   Certainly. I grew up in Boston, went to college,
   22   undergraduate, two years to Dartmouth Medical School, received
   23   my doctorate in medicine from Harvard Medical School.
   24   Following that, I trained in internal medicine at Boston City
   25   Hospital for two years. I then spent two years in the Public

                        GR      OCR      CM      CSR

PAGE 182

Burns-direct-Fitzpatrick                                           654

    1   Health Service at the Centers for Disease Control, the
    2   National Clearing House for Smoking and Health; I subsequently
    3   spent three years in a fellowship in lung disease at the
    4   University of California San Diego training in both chest
    5   medicine, lung disease and critical care.
    6   Q   You're a professor at the University of San Diego Medical
    7   School?
    8   A   Yes, been on the faculty at the San Diego Medical School
    9   since 1979. I'm now a full professor there.
   10   Q   You mentioned Centers for Disease Control. What are the
   11   Centers for Disease Control?
   12   A   The Centers for Disease Control are one agency of the
   13   U.S. Public Health Service. It is the agency that is
   14   responsible for disease prevention and control. Originally,
   15   they started out controlling malaria, yellow fever, other
   16   infectious diseases. Then in the last 30 -- well, the last
   17   50 years -- they've begun to become involved in controlling
   18   chronic diseases as well, both initially tuberculosis and
   19   subsequently diseases such as cancer, heart disease, lung
   20   disease.
   21   Q   Dr. Burns, you have spent a fair amount of time studying
   22   the issues of tobacco an health, have you not?
   23   A   I have.
   24   Q   Would you describe your career in that area, please?
   25   A   When I went into the Public Health Service, I spent two

                        GR      OCR      CM      CSR

PAGE 183

Burns-direct-Fitzpatrick                                           655

    1   years with the National Clearing House for Smoking and
    2   Health. That was the organization within the U.S. Public
    3   Health Service that was responsible for producing the Surgeon
    4   General reports, also for collecting the entire world's
    5   literature, everything that was published on smoking and
    6   health and reviewing it as well as conducting programs to try
    7   and change smoking behavior.
    8           During that two year period of time I wrote the 1975
    9   Surgeon General's report and was involved in many of the
   10   activities of the Bureau of Health, Education and the National
   11   Clearing House for Smoking and Health in efforts to change
   12   smoking behavior.
   13           Subsequent to that, I went to train in lung disease
   14   as I've described and in 1978 when Joseph Califano became
   15   Secretary of Health and Human Services, he decided on
   16   consultation with the physicians in the Public Health Service
   17   that smoking was a very serious and very high priority issue.
   18   He then commissioned a complete review of everything that was
   19   known up until that time on smoking and health. That became
   20   the 1979 Surgeon General's report, about 2025 pages long. I
   21   had the privilege of being both an author and editor for that
   22   volume.
   23           Because of that experience and because of my
   24   interest, I maintained a relationship with the Office on
   25   Smoking and Health. I was an associate scientific editor for

                        GR      OCR      CM      CSR

PAGE 184

Burns-direct-Fitzpatrick                                           656

    1   each of the next three Surgeon General's reports, the one in
    2   1980 which was Health Consequences for Women. That has been
    3   updated today, as a matter of fact with a new report that's
    4   been released today.
    5           In 1981 it was a report on the change in cigarette,
    6   new low tar nicotine cigarettes. In 1982 we produced a report
    7   on cancer.
    8           My involvement increased from that point on in that I
    9   became the senior scientific editor for those volumes,
   10   accepted more responsibility for the finding of scientific
   11   content, for helping to select individuals who would
   12   participate in drafting those volumes and I was the senior
   13   scientific editor for the volume on chronic lung disease --
   14   sorry, I left one out.
   15   Q   Perhaps we could interrupt you. We have a demonstrative
   16   that may help your recollection.
   17   A   All right.
   18   Q   Does this list the various Surgeon General reports that
   19   you've been involved with?
   20   A   Yes, this is a list of the Surgeon General's reports from
   21   1975 through 2000. The only one missing is the one that was
   22   released today. I have been the author, editor or senior
   23   reviewer for each of these reports since 1975.
   24           We've gotten to 1982. In 1983 I was also an
   25   associate scientific editor for the volume on heart disease,

                        GR      OCR      CM      CSR